Judge Ira DeMent, of the United States District Court for the Middle District of Alabama, certified to this Court two questions, pursuant to Rule 18, Ala.R.App.P., relating to claims by parents and guardians alleging breach of contract, fraud, and negligence against an Alabama boarding school.[1] Those questions are:
 "[1] What is the standard to apply in determining whether a plaintiff is seeking to circumvent the principle that there is no cognizable cause of action for educational malpractice in Alabama? [2] Alternatively, do plaintiffs' breach of contract, fraud, and negligence claims raised in the instant action represent an improper attempt to circumvent the principle that there is no cognizable cause of action for educational malpractice in Alabama?"
 Facts and Procedural History
Southern Normal School ("SNS") is a predominantly minority co-educational boarding school located in Brewton. SNS published brochures, school catalogs, and student handbooks, and, in an effort to recruit students nationally, it distributed those materials at educational workshops or mailed them to parents. Among other things, the 1993-94 school catalog specifically stated:
 "There are a number of advantages for attending a boarding school like Southern Normal High School. Among the most frequently cited are the following:
 "1. A seven days a week, 215 days a year wholesome, secure environment which is staffed around the clock by trained adults. These adults are experienced in helping adolescents, not only intellectually but also socially, athletically and artistically."
The school catalog also stated that SNS would implement the following "Code of Behavior":
 "The following rules and regulations apply to all. Breach of any is considered to be a serious violation and will demand a more than usual disciplinary action:
"(a) Possession of weapons
 "(b) Possession of, use, sale, or distribution of drugs or alcohol
"(c) Vandalism
 "(d) Disrespect of teachers, staff, volunteers or other adults on campus
"(e) Theft
"(f) Profanity and obscenities
"(g) Fighting *Page 254 
 "(h) Other serious inappropriate behavior or conduct such as smoking and drunkenness
"(i) Arson
"(j) Unacceptable behavior off campus
 "(k) Entertaining a member of the opposite sex in one's dormitory room
 "(l) Leaving campus without the permission of a responsible adult supervisor."
Every parent or guardian was provided with a variety of documents, including the student handbook and catalog, prior to the enrollment of his or her child at SNS. SNS's "enrollment contract" set out the parents' obligation to pay tuition and expenses for one full year of enrollment, but it contained no other terms regarding SNS's obligations to the students and/or their parents.[2]
Beverly Christensen, Polly Breland, Marie Washington and Wilbur T. Washington, Mae Robinson, Conrad Tinney and Sheryl Tinney, Kimberly Perry, Ola Mae Johnson, James Hobbs and Caryn Hobbs, and Margaret Jones (hereinafter collectively referred to as "parents") are parents and guardians whose children attended SNS during the 1993-94, 1994-95, and 1995-96 school terms.
Depositions of the students on whose behalf this action was filed revealed that violence frequently occurred in the SNS dormitories.[3]
According to those depositions, doors were kicked down, children were beaten in their rooms, and chairs were thrown at children in the boys' dormitory; male staff members distributed illegal drugs and alcohol to female students on campus; SNS staff members had sexual relations with female students on campus; and, two minor females were sexually assaulted while on campus.
On February 18, 1997, the parents sued SNS, Dr. Sherman Jones,[4]
Frederick Burks,[5] and Donald Watkins,[6] on behalf of their children. Because complete diversity of citizenship existed, the parents filed their complaint in the United States District Court for the Middle District of Alabama. The parents' complaint asserted breach-of-contract, fraud, and negligence claims against SNS.[7]
 Analysis
Breach-of-contract and fraud actions against educational institutions are not precluded under Alabama law. Blane v. Alabama Commerical Coll.,Inc., 585 So.2d 866 (Ala. 1991), VanLoock v. Curran, 489 So.2d 525 (Ala. 1986), and Craig v. Forest Inst. of Prof'l Psychology, 713 So.2d 967
(Ala.Civ.App. 1997). However, *Page 255 
Alabama does not recognize a cause of action for educational malpractice.Blane v. Alabama Commerical Coll., supra. Because the parents do not specifically assert a claim of educational malpractice, the federal court has requested that we provide a standard for its use in determining whether the parents' complaint indirectly asserts a claim of educational malpractice, a claim under which the plaintiffs could have no recovery.
Initially, we note that the overwhelming majority of states considering educational-malpractice claims have rejected them. Ross v. CreightonUniv., 957 F.2d 410, 414 (7th Cir. 1992). Several public-policy concerns prevent the courts from recognizing a cause of action for educational malpractice. First, no satisfactory standard of care exists by which the fact-finder could effectively evaluate an educator. Ross, 957 F.2d at 414. Second, the requisite elements of proximate cause and damage would be affected by uncertainties such as a student's attitude, motivation, and temperament. Ross, 957 F.2d at 414. Third, recognizing educational malpractice as a cause of action would create a huge potential for a flood of litigation against schools. Ross, 957 F.2d at 414. Finally, recognizing educational malpractice as a cause of action would threaten to embroil the courts in overseeing the day-to-day operation of schools.Ross, 957 F.2d at 414.
If the parents' negligence claims raise questions concerning the reasonableness of SNS's conduct in providing educational services, then the claims improperly assert a claim of educational malpractice. SeeHouston v. Mile High Adventist Acad., 872 F. Supp. 829, 833 (D.Colo. 1994); and Cencor, Inc. v. Tolman, 868 P.2d 396, 399 (Colo. 1994). Likewise, if the plaintiffs' negligence claims require an analysis of the quality of education received and in making that analysis the fact-finder must consider principles of duty, standards of care, and the reasonableness of the defendant's conduct, then the plaintiffs have asserted an educational-malpractice claim. See Houston v. Mile HighAdventist Acad., 872 F. Supp. at 833; and Cencor, Inc. v. Tolman, 868 P.2d at 399. In any event, to allow a negligence, breach-of-contract, or fraud claim alleging a poor educational experience or insufficient academic achievement would violate the public policy against putting courts in the business of second-guessing the academic performance of an educational institution.
We recognize that the basic legal relationship between a student and an educational institution is contractual in nature. Craig v. Forest Inst.of Prof'l Psychology, 713 So.2d 967, 973 (Ala.Civ.App. 1997) (quotingRoss v. Creighton Univ., supra, 957 F.2d at 416-17). Because a school and a student or the student's parents rarely use a formal, written contract, the general nature and terms of the contract between a school and the student or parents are usually implied. Craig, 713 So.2d at 973. Thus, the catalogs, bulletins, circulars, and regulations a school provides to its students are evidence of the contract it has with the student or the parents. Craig, 713 So.2d at 973. Therefore, if the plaintiffs' claims require only a determination whether the contract provisions were fulfilled, no educational-malpractice claim has been asserted.
Aside from any breach-of-contract claim, the plaintiffs may recover against SNS for fraud, if they properly pleaded and proved their fraud claims. See VanLoock v. Curran, supra, 489 So.2d at 534. In Blane, supra, this Court stated: "[E]vidence that a defendant made mere statements of opinion will not suffice as evidence of fraud inducing the signing of a contract. There must be a false assertion *Page 256 
of fact that is relied on by the other party." 585 So.2d at 867. Again, a claim cannot be couched as a fraud claim merely to avoid the doctrine that precludes an educational-malpractice claim.
Because we have answered question no. 1 by providing the federal court a standard to use in determining whether the parents' claims improperly assert a claim of educational malpractice, we decline to answer question no. 2.
ONE QUESTION ANSWERED; ONE QUESTION DECLINED.
Hooper, C.J., and Maddox, Houston, See, Lyons, Brown, Johnstone, and England, JJ., concur.
[1] Some of the students on behalf of whom the parents and guardians had sued have reached the age of majority during the pendency of this lawsuit and are not suing on their own behalf.
[2] The parties have stipulated that this "enrollment contract" is the only written contract entered into between SNS and the parents.
[3] Although in the federal district court the parents and SNS stipulated to certain facts, both sides also provided that court with a "joint diagram" articulating the specific claims alleged and damages requested, along with citations to the record for all arguments asserted regarding the parents' claims. Because the federal court considered the evidence from the joint diagrams in its discussion of the motions for summary judgment, we also consider that evidence in our discussion of the issues presented.
[4] Dr. Sherman Jones was the president and headmaster of SNS from 1993 through 1996.
[5] Frederick Burks served as the chairman of the board of trustees of SNS from the spring of 1992 to May 1995.
[6] Donald Watkins served as chairman of the board of trustees of SNS from May 1995 to the summer of 1996.
[7] The parents' complaint also contained two counts alleging "educational fraud." However, the district court entered a summary judgment on both educational-fraud counts, so we need not discuss those claims.